# Exhibit 1

ELECTRONICALLY FILED
7/16/2025 3:57 PM
66-CV-2025-900042.00
CIRCUIT COURT OF
WILCOX COUNTY, ALABAMA
HON. CAROLYN POSEY, CLERK

## IN THE CIRCUIT COURT FOR WILCOX COUNTY, ALABAMA

| | | |
|---|---|---|
| City of Camden | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | 66-CV-2025-900042.00 |
| Master Meter, Inc. and Empire Pipe & | ) | |
| Supply, Inc. | ) | TRIAL BY JURY REQUESTED |
| | ) | |
| Defendants. | ) | |

## **AMENDED COMPLAINT**

Plaintiff, City of Camden (the "City" or "Plaintiff"), brings this Complaint against Defendants Master Meter, Inc. ("Master Meter") and Empire Pipe & Supply Company, Inc. ("Empire Pipe") and alleges the following:

### STATEMENT OF THE CASE

1.      This lawsuit arises out of the purchase, installation, substandard replacement, and eventual complete failure of electronic water meter registers ("registers") designed, manufactured, and sold by Defendant Master Meter and marketed and distributed by Defendant Empire Pipe.

2.      Plaintiff operates the Camden Water Department which provides water and sewage services throughout the City. Plaintiff has been, and continues to be, damaged due to the negligent, reckless, willful, and wanton conduct of the Defendants which contracted or subcontracted with Plaintiff to install an Automated Meter Reading ("AMR") System or manufactured equipment including the registers to be used in conjunction with the AMR System which has malfunctioned and caused Plaintiffs to incur monetary damages.

3.      Upon information and belief, each of the Defendants were acting as the agents, servants, and employees of each other and in doing the actions alleged herein were acting within

the scope of their authority and with the permission and consent, either express or implied of each of the other Defendants.

4.      As a direct and proximate result of Named and Fictitious Defendants' acts and omissions, Plaintiff has suffered substantial economic and consequential damages, including, but not limited to, (1) the $267,600.00 paid to Defendants in connection with the Purchase and Installation Contract; (2) lost revenue; and (3) investigation, remediation, and repair costs including labor costs incurred to replace the defective registers.

5.      Wherefore, Plaintiff seeks compensatory, consequential, incidental, and punitive damages to the fullest extent allowed by award from a jury.

## JURISDICTION & VENUE

6.      Jurisdiction is proper in this Court pursuant to ALA. CODE §12-11-30(1), as Plaintiff's claims exceed $20,000.

7.      Venue is proper in this Court pursuant to ALA. CODE § 6-3-7(a)(1) because Wilcox County is where a substantial part of the events or omissions giving rise to the alleged conduct occurred. Venue is also proper pursuant to ALA. CODE § 6-3-7(a)(3) because it is the County where Plaintiff has its principal office in this State and Defendants conduct business by agent in Wilcox County.

8.      Plaintiff asserts no federal cause of action in this Complaint.

## PARTIES

9.      Plaintiff is a domestic municipal corporation formed pursuant to ALA. CODE §11-40-1 and is located in Wilcox County, Alabama. It is authorized to establish and operate a waterworks for its residents pursuant to ALA. CODE § 11-50-1.1.

10.      Defendant Master Meter, Inc. is a foreign corporation qualified to do business in the State of Alabama, and is causing injury in Wilcox County, Alabama. Master Meter's principal address is 101 Regency Parkway, Mansfield, Texas 76063. Master Meter's registered agent in Alabama, Corporation Service Company, Inc. is located at 641 South Lawrence Street, Montgomery, Alabama 36104.

11.      Defendant Empire Pipe & Supply Company, Inc. is a domestic corporation with its principal place of business located at 2301 Alton Road, Birmingham, Alabama, 35210, and is causing injury in Wilcox County, Alabama. Empire Pipe's registered agent, Jack P. Stephenson, Jr., is located at 420 North 20th Street, Suite 3400, Birmingham, Alabama 35203.

### FACTUAL ALLEGATIONS

12.      Plaintiff operates the Camden Water Department which provides water and sewage services to approximately 4,170 customers in Camden, Alabama.

13.      In or around 2012, Plaintiff decided to upgrade its water meter infrastructure to AMR technology to reduce the time and cost of manually reading water meters, improve its billing accuracy and efficiency, reduce water losses, and save money. Equipment manufactured by Defendant Master Meter was considered for that purpose.

14.      In or around 2010, Plaintiff and representatives from Defendants Master Meter and/or Empire Pipe met on multiple occasions to discuss their joint proposal to sell and install AMR technology manufactured by Defendant Master Meter. Upon information and belief, Defendant Empire Pipe is the local supplier of Defendant Master Meter's water meters in the State of Alabama.

15.      The proposals provided a detailed overview of the specifications of the water meters, their component parts manufactured by Defendant Master Meter, and the accompanying

AMR drive-by technology which transmitted the volume of water consumed by a customer via radio signal to a water utility employee driving by in a vehicle. The primary advantage of AMR technology is that a water utility employee did not have to leave their vehicle to manually check a water meter to record a customer's consumption.

16.     Upon information and belief, the materials distributed during the presentations expressly represented the benefits of Defendant Master Meter's AMR system. These representations include, but are not limited to, the following:

    a.  A 20-year "sustained accuracy warranty" for Master Meters' Multi-Jet water meter technology which equaled "**20 YEAR** Revenue Protection."

    b.  A 3G® Operations AMR system that would electronically transmit a meter reading every 11 seconds to the laptop of a water utility employee driving by. The design stated that the hermetically enclosed electronics would prevent moisture intrusion resulting in "less failure and increased reliability."

    c.  The 3G® AMR Features include, among other things, a "Warranty Advantage" that would "give you 20 years of electronics protection on your investment in the Master Meter AMR product." The warranty itself was also provided and stated that "Master Meter will repair or replace the product, at Master Meter's sole option, at no charge to the customer, subject to the terms of the warranty."

    d.  The City could retrofit existing water meters with Defendant Master Meter's 3G® Interpreter™ Register which offers all the benefits associated with AMR technology.

17.     On November 5, 2012, Plaintiff and Defendant Empire Pipe entered into the Vendor Agreement ("Contract") for the sale and installation of Defendant Master Meter's AMR System. The total project cost was $267,600.00 and included new water meter registers to be installed on either existing water meters manufactured by Neptune or new water meters manufactured by Defendant Master Meter, new Multi-Jet water meters of varying sizes, software/training, and computer and reading equipment. A copy of the Contract is attached hereto as Exhibit A.

18.     Plaintiff's representatives and representatives from Defendants Empire Pipe and Master Meter met to discuss the high volume of meter change out request[s] and the high volume of meters that are unable to be radio read which were problematic each cycle and month. These failures forced Plaintiff to send its technicians into the field to "manually get reads which also ultimately prevent[ed] delays in the bill run process."  Defendants agreed to order what was necessary to resolve meter change out issues. Plaintiff was not given a timeline of when product would stop being replaced at no cost to the City.

19.     From the time of installation, no less than 414 of Plaintiff's 1,409 registers (a failure rate of over 29%) malfunctioned for an unknown reason and had to be replaced.

20.     Plaintiff has received replacement registers from Defendants which have also subsequently failed and required replacement.

21.     On or about May 1, 2025, Plaintiff was told by Defendant that  Defendant would no longer be providing replacement registers at no charge to the City. Instead, Plaintiff would be required to purchase any replacements at a charge of $185 per register.

22.     Due to the recurring failure of Defendants' registers, Plaintiff has incurred unanticipated labor costs to pay its employees to manually read water meters with defective registers and to replace defective registers.  These labor costs include overtime because Plaintiff's employees had to complete these functions in addition to their daily tasks.

23.     Upon information and belief, all Defendants knew the register failures were caused by a software glitch which drained the batteries well before their 20-year life expectancy, and all Defendants knew about this defect at the time the registers were sold to Plaintiff, installed, and replaced.

24.     To date, Defendants have not made Plaintiff aware of this defect or its cause.

25.     The AMR System promised by Defendants and purchased by Plaintiff was never delivered.  Instead of having a fully operational AMR System that was warranted to last for 20 years, Plaintiff has had to replace nearly all its registers multiple times, incurred additional labor costs from its employees having to manually read water meters, incurred additional labor costs to replace registers that Defendants knew were defective and would prematurely fail, and incurred other damages to replace other defective registers which Defendants have continued to provide to replace failed registers.

26.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered substantial economic and consequential damages, including, but not limited to, (1) the $267,600.00 paid to Defendants in connection with the Contract; (2) lost revenue; (3) and investigation, remediation, and repair costs including labor costs incurred to replace the malfunctioning equipment.

## COUNT ONE
### Fraud

27.     Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

28.     Upon information and belief, Defendants Master Meter and Empire Pipe intentionally, willfully, and/or recklessly failed to disclose certain material facts that were known only to them and Plaintiff could not have discovered those facts.  Specifically, Defendants Master Meter and Empire Pipe failed to disclose that the registers manufactured by Master Meter were defective and would not operate for the warranted 20-year lifespan.  Upon undertaking an effort to replace failing registers, Defendants Master Meter and Empire Pipe also failed to disclose that the replacement registers were also defective.

29.     Defendants Master Meter and Empire Pipe knew that Plaintiff's decision to enter into the Contract was to upgrade its water meter infrastructure to an AMR system that would

improve meter reading accuracy, meter reading time efficiency and cost, and eliminate the need for its employees to manually read meters.

30.     These misrepresentations were material to Plaintiff's decision to enter into the Contract and were made or withheld to deceive and induce Plaintiff to enter into the Contract.

31.     Plaintiff reasonably relied on Defendants Master Meter and Empire Pipe's intentional, willful, and/or reckless representations that the registers would function properly.

32.     Plaintiff was not aware of, did not know, nor could have discovered, the concealed defects related to the registers.  Had Plaintiff known of those defects, it would not have entered into the Contract with Defendants Master Meter and Empire Pipe.  Thus, Plaintiff's consent to the Contract with Defendants is void due to these Defendants' fraud in inducing Plaintiff to enter into it and failure to disclose material facts.

33.     Upon information and belief, all Defendants knew the register failures were caused by a software glitch which drained the batteries well before their 20-year life expectancy, and all Defendants knew about this defect at the time the registers were sold to Plaintiff, installed, and replaced.

34.     Defendant has continued to supply Plaintiff with defective registers which continue to experience a high rate of failure.

35.     To date, Defendants have not made Plaintiff aware of this defect or its cause. Plaintiff has been harmed as a direct and proximate result of Defendants Master Meter and Empire Pipe's fraud.   Their concealment of material facts was a substantial factor in causing Plaintiff's damages.

WHEREFORE   PREMISES   CONSIDERED,   Plaintiff   demands   judgment   for compensatory damages against Defendants Master Meter and Empire Pipe, jointly and severally,

in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

## COUNT TWO
### Fraudulent Suppression

36.     Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

37.     Defendants Master Meter and Empire Pipe had a duty to disclose that the registers were defective, that the registers would not function for the entirety of the expected 20-year lifespan.

38.     Upon information and belief, Defendants Master Meter and Empire Pipe intentionally, willfully, and/or recklessly failed to disclose, concealed, and/or suppressed certain material facts that were known only to them and Plaintiff could not have discovered.  Specifically, Defendants Master Meter and Empire Pipe failed to disclose that the registers were defective and would not operate for the warranted 20-year lifespan.

39.     Defendants Master Meter and Empire Pipe knew that Plaintiff's decision to enter into the Contract was to upgrade its water meter infrastructure to an AMR system that would improve meter reading accuracy, meter reading time efficiency and cost, and eliminate the need for its employees to manually read meters.  Yet, they concealed and suppressed the defects which plagued Defendant Master Meter's registers.

40.     Plaintiff reasonably relied on Defendants Master Meter and Empire Pipe's intentional, willful, and/or reckless representations that the registers would function properly.

41.     These misrepresentations were material to Plaintiff's decision to enter into the Contract and were made, or the truth was withheld, to deceive and induce Plaintiff to enter into the Contract.

42.    Plaintiff was not aware of, did not know, nor could have discovered, the concealed defects related to the registers.  Had Plaintiff known of those defects, it would not have entered into the Contract with Defendants Master Meter and Empire Pipe.  Thus, Plaintiff's consent to the Contract with Defendants Master Meter and Empire Pipe is void due to their fraud in inducing Plaintiff to enter into it and their failure to disclose material facts to Plaintiff.

43.    Upon information and belief, all Defendants knew the register failures were caused by a software glitch which drained the batteries well before their 20-year life expectancy, and all Defendants knew about this defect at the time the registers were sold to Plaintiff, installed, and replaced.

44.    Defendant has continued to supply Plaintiff with defective registers which continue to experience a high rate of failure.

45.    To date, Defendants have not made Plaintiff aware of this defect or its cause.

46.    Plaintiff has been harmed as a direct and proximate result of Defendants Master Meter and Empire Pipe fraud.  Their concealment of material facts was a substantial factor in causing Plaintiff's damages.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against Defendants Master Meter and Empire Pipe, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

## COUNT THREE
### Negligent Misrepresentation

47.     Upon information and belief, Defendants Master Meter and Empire Pipe misrepresented the quality, reliability, and operational life of the electronic registers.  Specifically, Defendants Master Meter and Empire Pipe represented the registers would last for 20 years. However, in making these representations, Defendants Master Meter and Empire Pipe knew or had reason to know that they would not fulfill its obligations.

48.     Defendants Master Meter and Empire Pipe's misrepresentations were material to Plaintiff's decision to enter into the Contract.

49.     Defendants Master Meter and Empire Pipe's misrepresentations were made willfully to deceive Plaintiff, recklessly, without knowledge of their truthfulness, or mistakenly.

50.     Plaintiff reasonably relied on the representations made by Defendants Master Meter and Empire Pipe.

51.     The misrepresentations were negligent, in that Defendants Master Meter and Empire Pipe had no reasonable grounds for believing them to be true.  Instead, Defendants Master Meter and Empire Pipe knew, or should have known, that the registers were defective and that a high rate of failed  registers would jeopardize the integrity of Plaintiff's AMR System.

52.     As a direct and proximate result of the breach and the AMR system failing to operate as represented, Plaintiff lost full use of the registers and was required to reallocate its employees to manually read meters which resulted in Plaintiff incurring labor and installation costs to replace all defective registers.

WHEREFORE   PREMISES   CONSIDERED,   Plaintiff   demands   judgment   for compensatory damages against Defendants Master Meter and Empire Pipe, jointly and severally,

in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

## COUNT FOUR
### Breach of Implied Warranty of Merchantability

53.     Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

54.     Upon information and belief, all Defendants are merchants with respect to the design, manufacture, sale, or installation of water meters and their component parts.

55.     Defendants Master Meter and Empire Pipe impliedly warranted by operation of law that the Master Meter registers were of merchantable quality.

56.     Defendants breached the implied warranty of merchantability in that registers were not of merchantable quality and fit for its ordinary purpose for which registers were used, but in fact, completely failed well before their intended lifespan of 20 years.

57.     Plaintiff notified Defendants Master Meter and Empire Pipe of said failures and defects within a reasonable time of discovery, yet Defendants Master Meter and Empire Pipe have continued to supply Plaintiff with defective registers , and therefore, failed to return Plaintiff's AMR system to fully operating as represented.

58.     As a direct and proximate result of the breach, Plaintiff was required to use employees to manually read and eventually replace defective registers which resulted in Plaintiff incurring labor and installation costs.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against all defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

## COUNT FIVE
### Breach of Implied Warranty of Fitness for a Particular Purpose

59.     Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

60.     Plaintiff purchased the registers and the AMR system for the particular purpose of streamlining its collection of water consumption data and to save money.   Plaintiff expected the registers to be free of defects and perform for the entire 20-year time period and, in the event of a premature failure to receive replacement registers that were without defect.

61.     Upon information and belief, Defendants Master Meter and Empire Pipe knew or had reason to know that at the time of the purchase and installation of the registers, Plaintiff expected to use the registers for the entirety of their lifespan, and that such sufficient and reliable long-term performance of the registers was necessary for Plaintiff's AMR system to operate as intended and provide its water services to its customers.

62.     Upon information and belief, Defendants Master Meter and Empire Pipe knew or had reason to know that Plaintiff would rely upon the skill and judgment of Defendants Master Meter and Empire Pipe in the design, manufacture, and sale of said registers in providing registers fit for their particular purpose.

63.     Defendants Master Meter and Empire Pipe breached the implied warranty of fitness for a particular purpose because the registers were not fit for said purpose, but in fact, failed well before its intended lifespan of 20 years.

64.      Defendants breached the implied warranty of fitness for a particular purpose because the registers that were provided to Plaintiff to replace defective registers also failed.

65.    Plaintiff notified Defendants Master Meter and Empire Pipe of said failures and deficiencies within a reasonable time of discovery, yet Defendants Master Meter and Empire Pipe failed to repair or replace all the registers and return Plaintiff's AMR system to fully operational.

66.    As a direct and proximate result of the breach, Plaintiff was required to use employees to manually read and eventually replace defective registers which resulted in Plaintiff incurring labor and installation costs.

WHEREFORE    PREMISES    CONSIDERED,    Plaintiff    demands    judgment    for compensatory damages against Defendants Master Meter and Empire Pipe, jointly and severally, in an amount to be determined by a struck jury in an amount in excess.

## COUNT SIX
### Breach of Contract

67.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

68.    Defendants entered into a contract with Plaintiff promising to sell and install an AMR system with registers that would streamline its collection of water consumption data by obviating the need to manually read water meters and save money.

69.    Plaintiff paid $267,600.00 pursuant to the Contract and performed its obligations required under the Contract.

70.    Defendants breached the Contract when they sold and installed an AMR system with registers that failed to function properly and negated the automatic transmission of water consumption data which was the key factor that induced Plaintiff to enter into the Contract. Defendants Master Meter also breached the Contract by failing to replace defective registers with fully functional registers to return Plaintiff's AMR system to fully operational.

71.    As a direct and proximate result of the breach, Plaintiff was required to use employees to manually read and eventually replace defective registers which resulted in Plaintiff incurring labor and installation costs.

72.    As a direct and proximate result of the breach, Plaintiff purchased an AMR system that was never delivered and is entitled to damages incurred including up to the $267,600.00 paid to Defendants in connection with the Contract.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against all defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

## COUNT SEVEN
### Negligence

73.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

74.    Defendants owed a legal duty to Plaintiff to exercise reasonable and due care in their design, sale, or installation of a functional AMR system that was purchased by Plaintiff.

75.    Defendant Master Meter owed a legal duty to Plaintiff to supply Plaintiff with functional replacement registers when its existing register prematurely failed.

76.    Defendants owed a legal duty to Plaintiff to disclose the defective nature of its electronic registers.

77.    Defendants breached their duties owed to Plaintiff and, under the circumstances, Defendants' breaches constitute negligent, willful, and/or reckless conduct.

78.    As a direct and proximate result of the breach, Plaintiff was required to use employees to manually read and eventually replace defective registers which resulted in Plaintiff incurring labor and installation costs.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against all defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

## COUNT EIGHT
### Wantonness

79.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

80.    Defendants owed a legal duty to Plaintiff to exercise reasonable and due care in their design and installation of a functional AMR system that was purchased by Plaintiff.

81.    Defendants Master Meter and Empire Pipe owed a legal duty to Plaintiff to replace any defective registers with functional registers and ensure the AMR system functioned properly.

82.    Defendants owed a legal duty to Plaintiff to disclose the defective nature of its electronic registers. In breaching the duties described above, Defendants acted in a wanton, willful, and reckless manner.

83.    Defendants knew or should have known of the danger to Plaintiff created by Defendants' conduct, practices, actions, and inactions.

84.    Defendants knew or should have known of the likely impact, harm, damage, and injury their conduct would have on Plaintiff.

85.    Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard for Plaintiff's operations.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against all defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

## RELIEF DEMANDED

Wherefore, Plaintiff respectfully requests this Court grant the following relief:

a)    Declare the Contract is void due to the fraud perpetrated by Defendants Master Meter and Empire Pipe;

b)    Award Plaintiff all actual, consequential, incidental, and punitive damages resulting from the Defendants' breach of contract and tortious conduct in an amount to be proved at trial.

c)    Award attorney fees and costs and expenses incurred in connection with the litigation of this matter;

d)    Award such other and further relief as this Court may deem just, proper, and equitable.

## JURY DEMAND

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

Respectfully submitted, this 16th day of July 2025.

*/s/ Gavin F. King*
Gavin F. King (KIN099)

OF COUNSEL
Elizabeth G. Walden (WEY001)
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103-4160
(334) 269-2343 telephone
(334) 954-7555 facsimile
Gavin.King@beasleyallen.com
Elizabeth.Walden@beasleyallen.com

Mr. George W. Fendley, III (FEN005)
George W. Fendley, III, Attorney at Law
Post Office Box 261
Camden, Alabama 36726
(334) 682-5173 telephone
gfendlaw@frontiernet.net

William M. Pompey (POM001)
POMPEY & POMPEY, PC
Post Office Box 189
Camden, Alabama 36726-0189
(334) 682-9032 telephone
pandppc@frontiernet.net

Attorneys for Plaintiff

<u>DEFENDANTS TO BE SERVED BY CERTIFIED MAIL</u>

ELECTRONICALLY FILED
7/16/2025 3:57 PM
66-CV-2025-900042.00
CIRCUIT COURT OF
WILCOX COUNTY, ALABAMA
HON. CAROLYN POSEY, CLERK

# EXHIBIT A

# SPECIFICATIONS

# PROPOSAL AND CONTRACT DOCUMENTS

## CITY OF CAMDEN
## AUTOMATED METER READING SYSTEM (AMRS)

**CITY OF CAMDEN**

**CAMDEN, ALABAMA**

**September, 2012**

**Prepared by:**



Civil and Environmental Engineering
Andalusia, Alabama

# SPECIFICATIONS

# PROPOSAL AND CONTRACT DOCUMENTS

## CITY OF CAMDEN
## AUTOMATED METER READING SYSTEM (AMRS)

Prepared for:

**CITY OF CAMDEN**

**CAMDEN, ALABAMA**

Prepared by:

**DMD Engineers, Inc.**
**P.O. Box 610**
**201 East Troy Street**
**Andalusia, Alabama 36420**
**(334) 222-1849**



**September, 2012**

TABLE OF CONTENTS

ADVERTISEMENT FOR BIDS ........................................................................................1

INFORMATION FOR BIDDERS ...................................................................................2

BID BOND ......................................................................................................................5

BID FORM ......................................................................................................................7

AGREEMENT................................................................................................................11

NOTICE OF AWARD...................................................................................................15

CHANGE ORDER ........................................................................................................16

CERTIFICATION BY OWNER ...................................................................................17

GENERAL SPECIFICATIONS ....................................................................................18

## ADVERTISEMENT FOR BIDS

Sealed bids for the purchase of an **AUTOMATED METER READING SYSTEM (AMRS)** in Camden, Alabama will be received by the City of Camden at the Camden City Hall until **10:30 a.m., Thursday, October 18, 2012**, and then at said location publicly opened and read aloud.

The items to be purchased include water meters with integrated absolute encoders and radio frequency meter interface units, hardware, software and services required to implement the AMRS. Field equipment installation will be performed by Owner or under a separate Contract.

Specifications for the project may be examined at the office of DMD Engineers, Inc., 201 East Troy Street, Andalusia, Alabama or at the Camden City Hall in Camden, Alabama.

Copies of the Specifications may be obtained at the office of DMD Engineers, Inc., 201 East Troy Street, P. O. Box 610, Andalusia, Alabama 36420, upon deposit of $50.00 for each copy of the Specifications. The deposit will be refunded provided the Specifications are returned in reusable condition within 10 days of the bid opening.

Each bidder must submit with his bid, security in the amount, form, and subject to the conditions provided in the Information for Bidders.

The Owner reserves the right to reject any or all bids and to waive any informalities.

No bidder may withdraw his bid within 30 days after the actual date of the opening thereof.

Max Baggett, Jr., Mayor
City of Camden, Alabama

1

## INFORMATION FOR BIDDERS

Bids will be received by the **City of Camden** (herein called the Owner) at the **Camden City Hall, 223-A Claiborne Street; Camden, Alabama 36726** until **10:30 a.m., Thursday, October 18, 2012,** and then at said location publicly opened and read aloud.

Delivery of Proposal. Each bid must be submitted in a sealed envelope, addressed to the **City of Camden; 223-A Claiborne Street; Camden, Alabama 36726.**

Each sealed envelope containing a bid must be plainly marked on the outside as **"Bid for the City of Camden AMRS"** and the envelope should bear on the outside the name of the Bidder, his address and the name of the project for which the bid is submitted. If forwarded by mail, the sealed envelope containing the bid must be enclosed in another envelope addressed to the **City of Camden; P O Box 699; Camden, Alabama 36726.**

Preparation of Bid Form. All bids must be made on the required Bid Form. All blank spaces for bid prices must be filled in, in ink or typewritten, and the bid form must be fully completed and executed when submitted. Only one copy of the Bid Form is required.

The Bidder must specify in the space provided on the Bid Form if products are manufactured in Alabama by entering Y (yes) or N (no). In addition, the Bidder must also enter a delivery lead time in weeks for each item specified on the Bid Form.

The Owner is tax exempt in accordance with Code of Alabama, Title 40, Section 40-23-4. The Bidder shall exclude sales tax on all tangible items when completing Bid Form.

Attachments to Bid Form  The Bidder will be required to include specific documentation with the Bid Form. Only one copy of the documentation is required. An itemized list of required documentation is included in the Bid Form.

Withdrawal of Bids. Any bid may be withdrawn prior to the above scheduled time for the opening of the bids or authorized postponement thereof, provided a request in writing executed by the Bidder or his duly authorized representative is filed with the Owner prior to that time. Upon receipt and confirmation of such notice, the unopened bid will be promptly returned. Except as provided in the foregoing, no bid may be withdrawn.

General. The Owner may waive any informalities or minor defects or reject any and all bids. Any bid received after the time and date specified shall not be considered. Except for the condition described below, no Bidder may withdraw a bid within 30 days after the actual date of the opening thereof. Should there be reasons why the contract cannot be awarded within the specified period, the time may be extended by mutual agreement between the Owner and the Bidder.

Mistakes. The low bidder may seek withdrawal of his bid without forfeiture by providing written notice to the Owner within three working days after the date of the bid opening by providing convincing evidence he made a mistake in his bid caused by calculation or clerical error, an inadvertent omission, or a typographical error which causing his bid to be substantially out of proportion to that of other bidders. The Owner will make a decision within 10 days of receipt of the

2

bidder's notice, or by the next regular meeting of the awarding authority. In no event, shall a mistake of law, judgement, or opinion constitute valid grounds for withdrawal of a bid without forfeiture. Upon withdrawal of bid without forfeiture, the low bidder who withdraws his bid due to a mistake shall not be allowed to participate in any work on the contract in any capacity, and shall not be allowed to participate in a rebid of the project.

A conditional or qualified Bid will not be accepted.

Interpretation of the Quantities in Bid Schedule. Bidders must satisfy themselves of the accuracy of the estimated quantities in the Bid Schedule by review of the specifications, including Addenda. After bids have been submitted, the Bidder shall not assert that there was a misunderstanding concerning the quantities of items or the nature of services to be provided. Although the estimate of quantities listed in the Bid Schedule represent the current meters in the system, they are to be considered as only approximate estimates of the quantities of the different pay items and are to be used only as a basis for comparing bids for awarding the contract. Payment to the Vendor will be made only for the actual quantities of equipment supplied and actual services performed in accordance with the Specifications. If, upon completion, the actual quantities listed under unit price bids shall show either increase or decrease from the quantities shown in the Bid Schedule, the unit prices bid will prevail, except as otherwise provided for herein.

The right is reserved to increase or decrease any or all of the amounts given in the approximate quantities as shown in the Bid Schedule, with the understanding that equipment to be furnished and the services to be performed may be increased or decreased not exceeding twenty-five percent (25%) of the total money value of the contract without in any way invalidating the bid prices.

Examination of Specifications, Special Provisions and Site of Work. All Bidders are required to examine carefully the Bid Form, General Conditions, General Specifications and Agreement Form. The submission of a Bid Form shall be prima facie evidence that the Bidder has made such examination and has judged for and satisfied himself as to the conditions to be encountered; as to the character quality and quantities of products and services to be furnished; as to the requirements of Specifications, Conditions, and Agreement; and as to the contingencies. No adjustments or compensation will be allowed for losses caused by failure to comply with the above requirements.

Details. The Bidder must specify for both dollars and cents (without interlineation, alterations or erasures, unless initialed by the signer of the proposal) a unit price for each of the separate items for which a quantity is given in the proposal form (except when alternate bids are called for on items) and shall show the products of the respective unit prices and the estimated quantities in the columns provided for that purpose except that any item noted for a "Lump Sum" bid shall have the same amount under the column provided in the proposal for "Unit Price" as that written numerically in the "Amount Bid" column. All figures shall be inked or typed. The Owner will check the extension of each item given in the proposal and correct all errors or discrepancies. The gross sum obtained by adding all of the products of the unit prices and the various estimated quantities listed in the proposal with the lump sum items shall prevail and this shall be the contract bid price.

Signing. The Bidder's proposal must be signed in ink by the individual, by one or more members of the partnership, or by one or more offices of a corporation, or by an agent of the Vendor legally qualified and acceptable to the Owner. If the proposal is made by an individual, his name and post office address must be shown; by a corporation, the name of the corporation and the business address

3

of its corporate officials must be shown.

Irregular Bids.  Bids will be considered irregular and may be rejected if they contain any omissions, alterations of form, additions not called for, alternate bids unless called for, incomplete bids, erasures or alterations not initialed by the person signing the proposal, or other irregularities of any kind.

Information.  The Owner shall provide to Bidders prior to Bidding, all information which is pertinent to, and delineates and describes, the land owned and rights-of-way acquired or to be acquired.

Contract Documents.  The Contract Documents contain the provisions required for the construction of the Project.  Information obtained from an officer, agent, or employee of the Owner or any other person shall not affect the risks or obligations assumed by the Contractor or relieve him from fulfilling any of the conditions of the contract.

Bond Requirements.  Each Bid must be accompanied by a Bid Bond payable to the Owner for five percent of the total amount of the Bid not to exceed $10,000.00.  As soon as the Bid prices have been compared, the Owner will return the Bonds of all except the three lowest responsible Bidders.  When the Agreement is executed, the Bonds of the two remaining unsuccessful Bidders will be returned. The Bid Bond of the successful Bidder will be retained until the Payment Bond and Performance Bond have been executed and approved, after which it will be returned.  A certified check may be used in lieu of a Bid Bond.

Execution of Agreement.  The party to whom the Contract is awarded will be required to execute the Agreement within fifteen (15) calendar days from the date when Notice of Award is delivered to the Bidder.  The Notice of Award shall be accompanied by the necessary Agreement Form.  In case of failure of the Bidder to execute the Agreement, the Owner may at his option consider the Bidder in default, in which case the Bid Bond accompanying the proposal shall become the property of the Owner to be processed in accordance with prevailing law.

The Owner within twenty (20) days of receipt of Agreement signed by the party to whom the Agreement was awarded shall sign the Agreement and return to such party an executed duplicate of the Agreement.  Should the Owner not execute the Agreement within such period, the Bidder may by Written Notice withdraw his signed Agreement.  Such notice of withdrawal shall be effective upon receipt of the notice by the Owner.

Qualifications of Bidders.  The Owner may make such investigations as he deems necessary to determine the ability of the Bidder to perform the work, and the Bidder shall furnish to the Owner all such information and data for this purpose as the Owner may request.  The Owner reserves the right to reject any Bid if the evidence submitted by, or investigation of, such Bidder fails to satisfy the Owner that such Bidder is properly qualified to carry out the obligations of the Agreement and to complete the Work contemplated therein.

Responsibilities of Bidders.  Each Bidder is responsible for reading and being thoroughly familiar with the Contract Documents.  The failure or omission of any Bidder to do any of the foregoing shall in no way relieve any Bidder from any obligation in respect to this Bid.

Engineer.  The Engineer is DMD Engineers, Inc., P. O. Box 610 (201 East Troy Street), Andalusia, Alabama 36420; (334) 222-1849.

4

AIA Document A310
# Bid Bond

KNOW ALL MEN BY THESE PRESENTS, THAT WE   Empire Pipe & Supply Company

 2301 Alton Road, Birmingham, AL  35210

as Principal, hereinafter called the Principal, and  Platte River Insurance Company

 PO Box 5900,  Madison, WI  53705

a corporation duly organized under the laws of the State of                          NE

as Surety, hereinafter called the Surety, are held and firmly bound unto  City of Camden

                          108 Water Street,  Camden, AL  36726-1731

as Obligee, hereinafter called the Obligee, in the sum of    Five Percent of Amount Bid

Dollars ($           5%           ),
for the payment of which sum well and truly to be made, the said Principal and the said Surety, bind ourselves, our heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Principal has submitted a bid for  Automated Meter Reading System

NOW, THEREFORE, if the Obligee shall accept the bid of the Principal and the Principal shall enter into a Contract with the Obligee in accordance with the terms of such bid, and give such bond or bonds as may be specified in the bidding or Contract Documents with good and sufficient surety for the faithful performance of such Contract and for the prompt payment of labor and materials furnished in the prosecution thereof, or in the event of the failure of the Principal to enter such Contract and give such bond or bonds, if the Principal shall pay to the Obligee the difference not to exceed the penalty hereof between the amount specified in said bid and such larger amount for which the Obligee may in good faith contract with another party to perform the Work covered by said bid, then this obligation shall be null and void, otherwise to remain in full force and effect.

Signed and sealed this        18th        day of                  October                  ,   2012

_____    Empire Pipe & Supply Company
                (Witness)                               (Principal)                    (Seal)
                                                   By: _____
                                                                                          (Title)

Jody Chandler        (Witness)         Platte River Insurance Company
                                                               (Surety)                    (Seal)
                                                   By: _____
                                                   Attorney-in-Fact    Mark W. Edwards, II         (Title)

AIA DOCUMENT A310 ● BID BOND ● AIA ● FEBRUARY 1970 ED. ● THE AMERICAN
INSTITUTE OF ARCHITECTS, 1735 N.Y. AVE., N.W., WASHINGTON, D.C. 20006

41259152

# PLATTE RIVER INSURANCE COMPANY
## POWER OF ATTORNEY

**KNOW ALL MEN BY THESE PRESENTS**, That the **PLATTE RIVER INSURANCE COMPANY**, a corporation of the State of Nebraska, having its principal offices in the City of Middleton, Wisconsin, does make, constitute and appoint

------------------JEFFREY M WILSON; WILLIAM M SMITH; MARK W EDWARDS II; EVONDIA H WOESSNER; ROBERT R FREEL --------------------
---------------------------------------------------------- ALISA B POUNDERS ----------------------------------------------------------------

its true and lawful Attorney(s)-in-fact, to make, execute, seal and deliver for and on its behalf, as surety, and as its act and deed, any and all bonds, undertakings and contracts of suretyship, provided that no bond or undertaking or contract of suretyship executed under this authority shall exceed in amount the sum of

-------------------------------------- ALL WRITTEN INSTRUMENTS IN AN AMOUNT NOT TO EXCEED: $5,000,000.00-------------------------------

This Power of Attorney is granted and is signed and sealed by facsimile under and by the authority of the following Resolution adopted by the Board of Directors of **PLATTE RIVER INSURANCE COMPANY** at a meeting duly called and held on the 8th day of January, 2002.

**"RESOLVED**, that the President, and Vice-President, the Secretary or Treasurer, acting individually or otherwise, be and they hereby are granted the power and authorization to appoint by a Power of Attorney for the purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, one or more vice-presidents, assistant secretaries and attorney(s)-in-fact, each appointee to have the powers and duties usual to such offices to the business of the Corporation; the signature of such officers and the seal of the Corporation may be affixed to such power of attorney or to any certificate relating thereto by facsimile, and any such power of attorney or certificate bearing such facsimile signatures or facsimile seal shall be valid and binding upon the Corporation in the future with respect to any bond or undertaking or other writing obligatory in the nature thereof to which it is attached. Any such appointment may be revoked, for cause, or without cause, by any of said officers, at any time."

**IN WITNESS WHEREOF**, the **PLATTE RIVER INSURANCE COMPANY** has caused these presents to be signed by its officer undersigned and its corporate seal to be hereto affixed duly attested, this 2nd day of May, 2011.

Attest:

*Richard W. Allen*
Richard W. Allen III
President
Surety & Fidelity Operations

**PLATTE RIVER INSURANCE COMPANY**

*David F. Pauly*
David F. Pauly
CEO & President

(SEAL — PLATTE RIVER INSURANCE COMPANY, CORPORATE SEAL, NEBRASKA)

STATE OF WISCONSIN
COUNTY OF DANE } S.S.:

On the 2nd day of May, 2011 before me personally came David F. Pauly, to me known, who being by me duly sworn, did depose and say: that he resides in the County of Dane, State of Wisconsin; that he is President of **PLATTE RIVER INSURANCE COMPANY**, the corporation described herein and which executed the above instrument; that he knows the seal of the said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that he signed his name thereto by like order.

STATE OF WISCONSIN
COUNTY OF DANE } S.S.:

(SEAL — DANIEL W. KRUEGER, CERTIFICATE)

*Daniel W. Krueger*
Daniel W. Krueger
Notary Public, Dane Co., WI
My Commission Is Permanent

I, the undersigned, duly elected to the office stated below, now the incumbent in **PLATTE RIVER INSURANCE COMPANY**, a Nebraska Corporation, authorized to make this certificate, **DO HEREBY CERTIFY** that the foregoing attached Power of Attorney remains in full force and has not been revoked; and furthermore, that the Resolution of the Board of Directors, set forth in the Power of Attorney, is now in force.

Signed and sealed at the City of Middleton, State of Wisconsin this **18th** day of **October**, 2012.

(SEAL)

*Alan S. Ogilvie*
Alan S. Ogilvie
Secretary

THIS DOCUMENT IS NOT VALID UNLESS PRINTED ON GREEN SHADED BACKGROUND WITH A RED SERIAL NUMBER IN THE UPPER RIGHT HAND CORNER. IF YOU HAVE ANY QUESTIONS CONCERNING THE AUTHENTICITY OF THIS DOCUMENT CALL 800-475-4450.

PR-POA (5-11)

**BID FORM**
for the
**CITY OF CAMDEN**
**AUTOMATED METER READING SYSTEM (AMRS)**
for
**The City of Camden**
**Camden, Alabama**

Date: _October 18, 2012_

Proposal of _Empire Pipe + Supply Co_

License No. _N/A_ of _2301 Alton Rd. Birmingham, AL 35210_
(Address)

for the purchase of the **City of Camden Automated Meter Reading System.**

To the **City of Camden,** hereinafter referred to as the Owner:

The following proposal is made in behalf of the undersigned Bidder and no others. Evidence of authority to submit the proposal is herewith furnished. The proposal is made without collusion on the part of any other person, firm or corporation.

The undersigned Bidder certifies that he has carefully examined the attached Specifications for this Project, including the Special Provisions, and has personally examined the site of the work. On the basis of the Specifications, the undersigned Bidder proposes to furnish all necessary equipment hardware, software and integration services required to implement an **Automated Meter Reading System (AMRS)** in the manner specified.

The undersigned Bidder understands that the Owner is tax exempt in accordance with Code of Alabama, Title 40, Section 40-23-4. The Bidder understands to exclude sales tax on all tangible items when completing Bid Form.

The undersigned Bidder understands that the quantities below are approximate only and are subject to either increase or decrease and hereby proposes to perform any increase or decrease in quantities of work at the unit price bid.

The undersigned Bidder acknowledges receipt of the following Addenda:

No._____, Dated_____.        No._____, Dated_____.

No._____, Dated_____.        No._____, Dated_____.

The Bidder agrees that this bid shall be good and may not be withdrawn for a period of 30 calendar days after the scheduled closing time for receiving bids, except as approved by the Owner.

The Bidder understands that the Owner reserves the right to reject any or all bids and to waive any informalities in the bidding.

Upon receipt of written notice of the acceptance of this bid, bidder will execute the formal contract attached within ten (10) days. The bid security attached in the sum of **5% of bid amount** ($267,600.00) is to become the property of the Owner in the event the contract is not executed within the time above set forth, as liquidated damages for the delay and additional expenses the Owner caused thereby.

**The Bidder understands that the following are required attachments to Bid Documents:**

1. Affidavit affirming the percentage of both manufacturing and assembly of water meter chambers, main-case, register and radio interface units that occur in the continental United States.

2. A letter to the manufacturer, from NSF International, on NSF letterhead, documenting compliance with NSF/ANSI 61, Annex G, which allows a maximum weighted average lead content level of 0.25% of the wetted surface area.

3. A letter to the manufacturer, from NSF International, on NSF letterhead, documenting compliance with NSF/ANSI 61, Annex F, which requires leaching of less than 5μg/L in tests performed per the NSF/ANSI 61 test methodology for water with pH of 5 and pH of 10.

4. Documentation from the manufacturer that its US-based foundry uses only lead free materials in the manufacture of its water meters. This required documentation shall be signed by an authorized officer of the manufacturing company.

5. Product Specifications for each component of the system.

6. Manufacturer's most current nationally published warranty statements for water meters, absolute encoder/ radio frequency meter interface units and meter reading system.

7. A list of six (6) references including contact names and numbers for similar sized projects where AMRS products and services were provided.

8. The Bidder must provide documentation that will explain their ability and experience in providing additional training and assistance to the City of Camden for the AMR system.

The undersigned Bidder agrees to perform all the work described in the Contract Documents for the following unit prices:

8

## CITY OF CAMDEN

| Item | Description | Qty | Unit | Unit Price | Extension | Manuf. in Alabama? Y/N | Delivery Lead Time (wks) |
|------|-------------|-----|------|------------|-----------|------------------------|--------------------------|
| 1. | 5/8" x 3/4" Positive Displacement Water Meter with Absolute Encoder and Radio Frequency Meter Interface Unit | 1350 | EA | $161.50 | $218,025.00 | N | 2-3 |
| 2. | 1" Positive Displacement Water Meter with Absolute Encoder and Radio Frequency Meter Interface Unit | 18 | EA | $250.00 | $4,500.00 | N | 2-3 |
| 3. | 1 1/2" Positive Displacement Water Meter with Absolute Encoder and Radio Frequency Meter Interface Unit | 1 | EA | $425.00 | $425.00 | N | 2-3 |
| 4. | 2" Compound Water Meter with Absolute Encoder and Radio Frequency Meter Interface Unit | 33 | EA | $1,050.00 | $34,650.00 | N | 2-3 |
| 5. | 4" Compound Water Meter with Absolute Encoder and Radio Frequency Meter Interface Unit | 2 | EA | $1,750.00 | $3,500.00 | N | 2-3 |
| 6. | 6" Compound Water Meter with Absolute Encoder and Radio Frequency Meter Interface Unit | 2 | EA | $3,250.00 | $6,500.00 | N | 2-3 |
| 7. | Handheld Data Collection System | 1 | EA | O | O | N | 2-3 |
| 8. | Mobile Data Collection System | 1 | EA | O | O | N | 2-3 |
| 9. | Host Software including Two Day Onsite Training | 1 | LS | O | O | N | 2-3 |

**TOTAL BID AMOUNT** $ 267,600.00

Signature of Bidder (if a firm or individual)_____

By_____

Address of Bidder_____

Names and addresses of members of firm_____

_____

_____

_____

Signature of Bidder (if a corporation)___ *Mike Campbell* ___

___ *Mike Campbell* ___        ___ *2301 Alton Rd Birmingham, Al 35210* ___
President                                      Address

___ *Mike Sawyer* ___           ___ *2301 Alton Rd Birmingham, Al 35210* ___
Secretary                                     Address

___ *Mike Sawyer* ___           ___ *2301 Alton Rd Birmingham, Al 35210* ___
Treasurer                                     Address

Corporate Seal

Name of state under the law of
which the corporation is chartered:

Attest: _____        ___ *Alabama* ___

10

**VENDOR AGREEMENT**

THIS AGREEMENT, made this 5th day of November, 2012, by and between the **City of Camden,** hereinafter called "OWNER" and **Empire Pipe & Supply Company** doing business as a corporation hereinafter called "VENDOR".

WITNESSETH: That for and in consideration of the payments and agreements hereinafter mentioned:

1.  The VENDOR will furnish all of the Products and Services described by the CONTRACT DOCUMENTS for a complete **AUTOMATED METER READING SYSTEM (AMRS)**

2.  The OWNER agrees to pay the VENDOR for Products and Services described in the CONTRACT DOCUMENTS and comply with the terms therein for the sum of Two Hundred Sixty-Seven Thousand Six Hundred Dollars and 00/100's ($267,600.00), or as shown in the BID schedule.

3.  The term "CONTRACT DOCUMENTS" means and includes the following:

    (A)  ADVERTISEMENT FOR BIDS

    (B)  INFORMATION FOR BIDDERS

    (C)  BID

    (D)  AGREEMENT

    (E)  NOTICE OF AWARD

    (F)  CHANGE ORDER

    (G)  SPECIFICATIONS prepared or issued by **DMD Engineers, Inc.** dated **September, 2012**

    (H)  ADDENDA

         No._____, dated _____, 2012

         No._____, dated _____, 2012

11

No._____, dated _____, 2012

No._____, dated _____, 2012

No._____, dated _____, 2012

4.     CHANGE ORDERS

4.1     The OWNER may at any time, as the need arises, order changes within the scope of the WORK without invalidating the Agreement. If such changes increase or decrease the amount due under the CONTRACT DOCUMENTS, or in the time required for performance of the WORK, an equitable adjustment shall be authorized by CHANGE ORDER.

4.2     The CONTRACT PRICE may be changed only by a CHANGE ORDER. The value of any WORK covered by a CHANGE ORDER or of any claim for increase or decrease in the CONTRACT PRICE shall be determined by one or more of the following methods in the order of precedence listed below:

     (a)     Unit prices previously approved.

     (b)     An agreed lump sum.

     (c)     The actual cost of materials, supplies, equipment, and other services necessary to complete the work. In addition there shall be added an amount to be agreed upon but not to exceed fifteen (15) percent of the actual cost of the WORK to cover the cost of general overhead and profit.

5.     The OWNER is TAX EXEMPT, therefore, the VENDOR shall not include sales tax on invoices for tangible items purchased by the OWNER under this CONTRACT.

6.     PAYMENTS

6.1     Payments will be made on the basis of invoices submitted by the VENDOR for 100% of total amount shown on the invoices, provided 100% of products invoiced have been delivered to the OWNER and 100% of services invoiced have been performed by the VENDOR.

OWNER will be given a 2% discount off the total invoice amount, for payments made to the VENDOR in this manner.

7.    The VENDOR shall recognize that as a result of this AGREEMENT, it may be provided with confidential information. Neither VENDOR nor its employees or agents will disclose any confidential information obtained by Vendor.

8.    The VENDOR will indemnify and hold harmless the OWNER and the ENGINEER and their agents and employees from and against all claims, damages, losses and expenses including attorney's fees arising out of or resulting from this AGREEMENT, provided that any such claims, damage, loss or expense is attributable to bodily injury sickness, disease or death. or to injury to or destruction of tangible property including the loss of use resulting therefrom; and is caused in whole or in part by any negligent or willful act or omission of the VENDOR, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable.

9.    Neither the VENDOR nor the OWNER shall sell, transfer, assign or otherwise dispose of the Contract or any portion thereof or of his right, title or interest therein, or his obligations thereunder, without written consent of the other party.

10.    The VENDOR represents and warrants that it has in place and will maintain appropriate insurance coverage through the duration of this AGREEMENT

11.    This AGREEMENT shall be binding upon all parties hereto and their respective heirs, executors, administrators, successors, and assigns.

13

their duly authorized officials, this Agreement in three (3) each of which shall be deemed an original on the date first above written.

OWNER:

**City of Camden**

BY _____

Name _____ Max Baggett _____

Title _____ Mayor _____

(SEAL)

ATTEST: _____

Name _____ Oletha Miller _____
        (Please Type)

Title _____ City Clerk _____

VENDOR:

**Empire Pipe & Supply Company**

BY _____

Name _____ Mike Campbell _____
        (Please Type)

(SEAL)

Address _2301 Alton Road_____

_Birmingham, Alabama 35210_____

ATTEST:

_____

Name _____ Mike Sawyer _____
        (Please Type)

14

To:    **Empire Pipe & Supply Company**
       **2301 Alton Road**
       **Birmingham, Alabama 35210**

PROJECT Description:  **CITY OF CAMDEN AUTOMATED METER**
                      **READING SYSTEM (AMRS)**

The OWNER has considered the BID submitted by you for the above described WORK in response to its Advertisement for Bids dated October 18, 2012, and Information for Bidders.

You are hereby notified that your BID has been accepted for items in the amount of Two Hundred Sixty-Seven Thousand Six Hundred Dollars and 00/100's ($267,600.00).

You are required by the Information for Bidders to execute the Vendor Agreement within fifteen (15) calendar days from the date of this Notice to you.

You are required to return an acknowledged copy of this NOTICE OF AWARD to the OWNER.

Dated this 5th day of November, 2012.

|  |  |
|---|---|
|  | **City of Camden** |
|  | Owner |
| By | _Max Poggin_ |
| Title | **Mayor** |

ACCEPTANCE OF NOTICE

Receipt of the above NOTICE OF AWARD is hereby acknowledged

by  Empire Pipe & Supply Company

this the  26  day of  November , 2012

By  _Mike Campbell_
        Mike Campbell

Title  President

15